430    COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,        Wright *et al.* vs. Graham.        1870.

# Wheeling.

## CATHARINE B. WRIGHT *et al.* vs. HARTLEY GRAHAM.

### January Term, 1870.

W., a married woman, holding property to her own use under a marriage settlement, through a trustee, and residing in Illinois when the war broke out, went to Richmond in September, 1861, and to avoid the confiscation of her property by the confederate government, executed her bond for 1600 dollars to her kinswoman, G., who resided in Richmond, which on its face purported to be for the maintenance and education of the daughter of W., prior to January 1st, 1861. G. brings suit on the bond and seeks to make the property of W., in the hands of her trustee, liable therefor. HELD:

I. That the bond is void by reason of being a transaction in violation public policy and the law against trading with an enemy.

II. That the property of W. was liable to a just amount for the maintenance and education of the daughter of W., expended by G. to that end. And the decree was reversed and the cause referred to a master to ascertain the correct amount due.

Bill filed in the circuit court of Jefferson county, at August rules, 1867, by Miss Hartley Graham against Catharine B. Wright, N. S. Wright, and William F. Turner. The bill claimed the indebetedness of Catharine B. Wright, to the plaintiff, in the sum of 1600 dollars, as evidenced by the following paper:

"I promise to pay to Hartley Graham, of Richmond, Virginia, the sum of sixteen hundred dollars for money lent me by her some years ago, and for money paid by her for board and tuition, traveling and other expenses of my daughter,

Maria A. Wright, prior to the 1st of January, 1861; whereof witness my hand and seal.      C. B. WRIGHT, [SEAL.]"

It appeared by the testimony in the cause that this paper was executed on the 24th of September, 1861.

The bill further charged that there was a marriage contract between Catharine and her husband John S. Wright, by which her property lying in Jefferson county was to be held by a trustee to her own separate use and control, and that subsequently her real estate had been sold, or contracted to be sold, to W. F. Turner, her brother; and that R. H. Lee was the trustee acting after the death of George W. Turner, the original trustee in the deed of marriage settlement. N. S. Wright was alleged to have estate belonging to Catharine in his hands. The bill further alleged that the defendant Catharine Wright was a non resident, and asked that the property, or the proceeds of the sale thereof, be applied to the payment of the plaintiff's claim.

The deed of marriage settlement was filed as an exhibit, and also an order to the trustee as follows:

"Mr. R. H. Lee will please pay to Miss Hartley Graham, the sum *whose* mentioned for value received in borrowed money and expenses of my daughter, Maria A. Wright.

"Sept. 24th, 1861.             C. B. WRIGHT."

The defendant Catharine answered the bill, alleging that whatever charge was due for the maintenance of the child, was chargeable to the father of the child Maria, John S. Wright, and claimed that her property was expressly exempted by the deed of marriage settlement from the liabilities of her husband. That in August, 1861, she had gone from Chicago, where she had resided for several years, to Clark county, Virginia, where she found R. H. Lee, her trustee, who refused to pay her or account to her for any of the estate held by him to her use. That upon learning that an act of confiscation had been passed by the confederate government, providing for the confiscation of the property of all loyal citizens within Virginia, and who resided out of that State, she was fearful of losing her property, and was

advised that she could save it by making it over to a Southern lady; whereupon she sought the aid of the plaintiff, her cousin, who was residing at Richmond.   That her trustee had theretofore deposited in the Valley Bank of Charlestown, in Jefferson county, 1600 dollars, and she sought to save at least that amount; that the plaintiff proffered her assistance, and it was for the purpose of preventing the confiscation, and no other, that the bond for 1600 dollars was executed; that she was at the time in the confederate capital, and was greatly distressed over the prospect of the loss of her property, and would not have executed the bond under other circumstances.   That she confided in the faithfulness of the plaintiff, and did not read the paper over.   That she never borrowed any money of the plaintiff, and was not indebted to the plaintiff at the time she signed the bond.

The respondent filed several letters to show that no compensation was designed to be paid to the plaintiff for the care of the child Maria.   That in August, 1859, the plaintiff had earnestly solicited the care and companionship of the child, then about nine years old.   That no contract was ever made as to compensation; that the child had been sent to school at the instance of the plaintiff alone; that all the care, maintenance, &c., was voluntarily bestowed by the plaintiff.   Respondent claimed to have fully compensated the plaintiff by articles of clothing, &c., a bill of which she filed with her answer.   That the child remained with plaintiff about two years after the execution of the bond.

The deposition of Andrew Hunter, taken by the plaintiff, proved that, prior to the defendant Catharine going to Richmond, in August, 1861, she had advised with him concerning her property, and regretted the probable loss of it, as she was indebted to the plaintiff "in a considerable amount, for the support and education of her daughter, and she would thus be deprived of the means of paying her."   That he subsequently received the bond for 1600 dollars, and the order on R. H. Lee, and he filed a bill against the defendant Catharine, by way of foreign attachment, to

enable the trustee to pay over the money to the plaintiff, and that the proceeding being explained to the defendant Catharine, met with her approbation.

The court below decreed that the plaintiff should recover the amount of the bond, with interest from September 24th, 1861. The defendant appealed to this court.

Hon. E. B. Hall, judge of the circuit court of Jefferson county, presided on the trial of the cause.

*Stanton & Allison* for the appellants.

*Charles J. Faulkner*, for appellee.

By an ante-nuptial agreement, executed on the 28th of August, 1846, the appellant conveyed her personal property and such real and personal estate as she might thereafter acquire, to a trustee to hold for her sole and separate use, free from the control and debts of her intended husband, and with full power to transfer, assign, or dispose of said estate, by any instrument of writing by her signed, or as she might appoint, by an instrument in writing, in the nature of a last will, attested by at least two witnesses.

The effect of this *ante*-nuptial agreement was to qualify the marriage contract subsequently solemnized between herself and her husband, so that Mrs. Wright retained all the rights which she could have exercised over the property as a *feme sole.*

The trustee was the mere depository of her title and estate, with no control over the fund, and simply interposed in order that her husband might not come to the possession or enjoyment of it without her consent, and that it might not be liable to the claims of his creditors, unless she chose so to apply it.

In August, 1859, the appellant placed her daughter—then a child of ten years of age—under the care and control of Miss Graham, who for a continuous period of four years, bore the expenses of her maintenance and education, and

bestowed upon her moral and intellectual training, the most careful and assiduous attention.     The husband, John S. Wright, a person without means or employment, does not seem to have had any connection with this arrangement for the schooling and support of his daughter.     It was the act exclusively of Mrs. Wright, who, throughout the entire correspondence of four years, constantly refers to her seperate estate as the means of defraying those expenses.

Mrs. Wright is a lady of considerable fortune, but during those four years her means and resources were tied up, by untoward circumstances, so that she could contribute very little to the support of her child, and was even compelled during that time to borrow money from Miss Graham.

Sometime in 1861, Catherine B. Wright executed her bond to Miss Graham for the sum of 1,600 dollars, expressing upon the face of it that it was for money loaned her some years before, and for money paid for the board, tuition, traveling and other expenses of her daughter prior to 1st of January, 1861, and on the 24th of September, 1861, she gave to Miss Graham a written order, on her trustee, for that amount.     This order was not paid.     The present bill has been filed to subject the separate property of Mrs. Wright to the payment of that debt.     The circuit court decreed its payment, and from that decree an appeal has been taken to this court.

From 1723, when the case of *Norton* against *Turvill* was decided, until 1793, the English decisions show an unbroken current of authority in support of the doctrine that a *feme covert,* in respect to her separate estate, is to be regarded in a court of equity as a *feme sole;* that she has full power to contract debts without the consent of her husband or trustee, and that her separate property was liable to her creditors for the debts so contracted.     During this period the foundations of our equity system were laid, and its principles illustrated by the genius and learning of Sir Joseph Jekyll, Lord Hardwicke and Lord Thurlow, and many other scarcely less distinguished luminaries of the bench.

No distinction was taken between her general debts and an assignment intended to attach specifically on the separate property, except that her general debts were only chargeable on her personal property and the rents and profits of her real estate. *Norton* v. *Turvill*, 2 P. Williams, 144; *Stanford* v. *Marshall*, 2 Atkins 68. *Parteriche* v. *Poulet*, 2 Atkins, 383; *Allen* v. *Popworth*, 1 Ves., sen., 163; *Heart* v. *Greenbank*, 1 Ves., sen., 300; *Grigsby* v. *Cox*, 1 Ves., sen., 517; *Peacock* v. *Monks*, 2 Ves., sen., 190; *Clarke* v. *Piston*, 3 Brown C. C., 346; *Hulme* v. *Tenant*, 1 Brown, C. C., 16; *Tithplace* v. *Georges*, 3 Brown, 8; *Lellia* v. *Aery*, 1 Vesey, jr., 277; *Pybus* v. *Smith*, 3 Brown C. C., 340.

In 1793 there commenced, under the lead of Lord Alvanly, a course of decision intended to narrow the principle upon which a *feme covert* was allowed to charge her separate estate. It was said by those holding this doctrine that as a *feme covert*, she was incapable of making a contract, but that as incident to the enjoyment of separate property, she had a *power to appoint it*, and that the courts would consider a security executed by her, as an appointment *pro tanto* of her separate estate. *Stuart* v. *Kirknall*, 3 Mad., 389. In such cases the security is implied to be an execution of her power to charge the property. 3 Mad., 94. The practical effect of this doctrine did not differ from the principle of liability established by Lord Thurlow and others, except, to exclude from a charge on the separate property, all mere *implied assumpsits*. This doctrine concedes that the separate estate of a married woman is liable to debts for which she has given a written security, whether the evidence of those debts makes any reference to her separate property or not.

It is said that the security must be supposed to have been executed with the intention that it should operate in some way, and that it can have no operation, except as against the separate estate. 2 Sch. & Lef., 264. Thus the separate estate was held liable to pay her bond. *Lellia* v. *Aery*, 1 Ves., jr., 277; *Hedley* v. *Thomas*, 15 Ves., 596. The same was held as to a bill of exchange accepted by a *feme covert*.

*Stuart* v. *Lord Kirknall,* 3 Mad., 387; *Owen* v. *Homon,* 4 H. L. Cases, 997, and as to a prommissory note given by a *feme covert. Bullpere* v. *Clarke,* 17 Ves., 365 ; *Field* v. *Sowle,* 4 Russ., 112. The liability of the separate estate for the general as well as the particular debts of the wife, has thus been admitted by every judge.   The only difference has been as to the principle upon which the liability was to rest.   In *Owens* v. *Dickenson,* Cr. & Ph., 48, Lord Cottenham restored the doctrine of the liability to the basis of reason and common sense, upon which it had been rested by Lords Hardwicke and Thurlow, rejecting the legal fiction upon which it had been placed by some of their successors,.and pointing out the inconsistencies of viewing the liability of a married woman, either as the execution of a power, or the creation of a charge.   It may, therefore, now be regarded as the settled law of England, "that property given to a woman for her separate use, without restraint as to anticipation, will be fastened upon in equity to make good her liabilities, contracted during coverture, however the liability may have been constituted." *Stead* v. *Neilson,* 2 Bear, 245; Bill on property of husband and wife, 520; L. L., Vol. 67; *Owens* v. *Dickenson,* 52; Eng. Chan. Reps., vol. 18.   Whilst it may be conceded that such is the settled law in England, yet it is maintained that according to the doctrine established in this country, the note or bond of a married woman will not charge her separate estate, except where a provision for that purpose is contained in the instrument creating the separate estate.   It is admitted that the doctrine has been carried to this extent in South Carolina, and that her courts have decided that a married woman "can in no manner or respect be considered a *feme sole;* a *feme sole* disposes of or charges her property by her own act and according to her own will, by her inherent power as owner; a *feme covert* exercises a delegated authority, and cannot exceed it." *Rochelle* v. *Tomkins,* 1 Strobart's Equity, 114.   This doctrine is also held in Rhode Island, Tennessee, Misissippi and Pennsylvania, but a different rule is recog-

nized in Connecticut, New York, Georgia, Alabama, Kentucky, Maryland and Missouri, and in the Circuit Court of the United States for the District of Columbia; so that the weight of American authority, not to add of Virginia, concurs with the English doctrine. *Imley* v. *Huntington*, 20 Connecticut Rep., 149, 175; New York, 17 Johnson, 548, 20 Wendall, 570; Ga., *Fears* v. *Brooke*, 12 Ga.; *Ozby* v. *Inklehamer*, 26 Ala.; *Lillard* v. *Turner*, 16 B. Monroe, 374; *Cooke* v. *Husbands*, 11 Md., 492; 7 Ohio, N. S., 208; 23 Missouri, 547, 357; C. C. of U. S. Dis't. Columbia, *Simms* v. *Scott*, 5 Cranch's C. C., 644.

In this case, by a proper construction of the deed of settlement, the appellant had full power to transfer, assign or dispose of her property by any instrument of writing signed by her. But suppose the court should be of the opinion that by a grammatical reading of the instrument, the requirement of the attestation of two witnesses applied not alone to an appointment in the nature of a *will*, but to any disposition of the property in her life time, still, the decisions are clear upon the point that the execution of the bond now sued upon need not be attested by two witnesses. See case of *Hulme* v. *Tenant*, 1 Brown Ch. C., 16. In that case Lord Thurlow held that the instrument, which, as a bond, was *nothing*, and which was not attested as required by the powers, was a sufficient indication of the intention of the wife as to the separate estate, with regard to which she must, upon the authorities, be deemed a *feme sole*. Lord Elden, *Sterling* v. *Rochefort*, 8 Ves., jr., 164; 3 Desaussure's Equity Reports, 439. Again, Lord Elden, in the case of *Parks* v. *White*, 11 Ves., jr., 209 to 237, says, "Lord Thurlow has considered the point well in *Hulme* v. *Tenant*, and looked to the authorities. Though the wife's putting her name to a bond is a mere nullity in law, it is evidence in equity of her intention, though not attested as the settlement required. He thought as she could have no other intention than to charge her separate estate, that informal instrument was such a charge."

It is argued that the bond is invalid as a charge upon the separate property of the wife, because created without the consent of her husband. No such consent is required by the deed,—none by the law. The deed secures the property to the wife free from the "control" of the husband. Where property is settled upon a married woman to her separate use, as she is, in regard to this property, viewed as a *feme sole*, she may dispose of it without the consent of her husband, whether the property is in possession or reversion. *Fellyplace* v. *George's*, 1 Ves., jr., 46; *Sturges* v. *Corps*, 13, Ves., 190; *Henden* v. *Rislur*, 1 McL. & M., 89; Bell on property of husband and wife, p. 403.

It is said the bond and order are invalid, because there was no consideration for their execution. The consideration is sustained by the bond and order, freely and without constraint, executed by the appellant; by the testimony of J. R. Tucker proving the services rendered, and by the testimony of Andrew Hunter proving her admission of the indebtedness. It is further abundantly proven by her letters, extending through a period of four years, during which time her daughter was fed, schooled and maintained by Miss Graham. The statements and admissions of Mrs. Wright, though a *feme covert*, are proper evidence against her in this case. 17 Johnson, *Jacques* v. *Meth. E. Church*, 593; 20 Wendall, *Dyatt* v. *N. N. Coal Co.*, 578.

In Virginia and West Virginia, the common law as found expounded in the decisions of the courts of England, and in the treatises of learned jurists prior to 1776, is made part of our legal and constitutional system, except where altered or repealed by the Legislature. Ordinance of Convention, May, 1776; *Murdock* v. *Hunter*, 1 Brock Reports, 140; Const. of West Va., art. 11, § 8; *Cunningham* v. *Dorsey*, 3 W. Va. Reports, 304, 305. In conformity to this authority, the supreme court of appeals of Virginia, in *West* v. *West's ex'ors*, 3 Rand., 373; *Vizonneau* v. *Pegram*, 2 Leigh, 183; *Woodson's Trustee* v. *Perkins*, 5 Gratt., 351, have fully sustained the English law as laid down by Lords Hardwicke and

Thurlow touching the power of a *feme covert* to dispose of and create liabilities on her property as a *feme sole.* If the case of *Williamson* v. *Beekham,* 8 Leigh, 20, is a seeming departure from the English law, the decision in that case is justified either, by the particular character of the conveyance, or is overruled in *United States* v. *Lee,* 9 Leigh, 200.

It is urged that the deposition of Andrew Hunter should be excluded from the consideration of the court, because of the exceptions endorsed on the deposition in the court below. The deposition was taken with the full knowledge of, and by arrangement with, the opposing counsel.

The exceptions, besides, are without force or meaning, but even if valid in the court below, as they were not brought to the notice of that court, nor passed upon by it, nor go to the competency of the witness, they must be disregarded here. *Fant* v. *Miller,* 17 Gratt., 227.

It is urged that the bond and order given by Mrs. Wright, are illegal and void because executed by her while domiciled in Illinois, and when the appellee was domiciled in Richmond, Virginia, and thus made in violation of the proclamation of the President of the United States, and the general policy of the government forbidding trade and intercourse between citizens of the loyal and insurgent States. To this it may be replied:

1. That no such point was taken in the pleadings in the court below, and cannot be considered by the court here.

2. The evidence shows that the bond and order were executed in Richmond Virginia; the appellant being in that city at the time.

3. The proclamation of President Lincoln of 14th of August, 1861, forbade *commercial* intercourse alone, and the transportation of goods, wares and merchandise, between the loyal and insurgent States. It did not extend to any other kind of intercourse or transaction, between the citizens of the two belligerent sections of the Union.

4. The principles of international law could not avoid this contract, as the citizens of the two sections, although

arrayed in hostility to each other, were not *alien enemies*. In the case of *Hedges* v. *Price*, 2 W. Va. Rep., 237, this court quotes with approbation the opinion of Chief Justice Chase, delivered at Raleigh, North Carolina, in case of *Shortridge & Co.* v. *Macon*, in which he announces, "That there is nothing in the opinion of the supreme court in the *Prize cases*, which gives countenance to the doctrine which counsel endeavor to deduce from it, to wit: 'that the insurgent States by the act of rebellion and by levying war against the nation, became *foreign States*, and their inhabitants *alien enemies.*'"

. 5. The debt claimed in this case was for money loaned, and services rendered *prior* to the war.

6. Mrs. Wright's visit to the south was in August, 1861, *prior* to President Lincoln's proclamation of non-intercourse.

BROWN, *President.*

The appellant was a married woman resident with her husband in the city of Chicago, in the State of Illinois. The appellee was an unmarried lady resident in the city of Richmond, in the State of Virginia, and a relative of the appellant. The appellant having estate and debts due her in her own right and for her sole and separate use by deed of settlement, went from Chicago to Richmond during the war, by permission of General Scott, and having before the war placed her infant daughter, about nine or ten years old, in the custody of the appellee, acknowledged herself indebted to the appellee in the sum of 1600 dollars, on account of support, education and advancement of the daughter, and at the same time gave the appellee an order on Richard H. Lee, her trustee, who had in his hands money of the said estate due to the appellant, but which he declined to pay to her, on account of her relation as resident of a loyal State, and the confiscation acts of the confederate government. It is manifest that the object of the parties was in the first instance, to save this property and money of the

appellant from being confiscated by the rebel authorities, and the transaction in question was the plan adopted to attain that end; and I think it equally clear, that upon the faith of it, and in payment of prior claims, the appellee received the note and order, and still further took care of the daughter of the appellant for a long time, and incurred considerable expense in her support, education and travel. She failed, however, it seems, to get the money from Mr. Lee, as expected; the confederates were too sharp for that, though the scheme was well laid and the agents apparently well selected. It is apparent, from the evidence and correspondence, that Mrs. Wright was indebted and under great obligations to Miss Graham for her care and support and education of her daughter, and fully recognized it before the war began. The same thing, and state of things, continued for a long period during the war. That Mr. Wright was insolvent, and Mrs. Wright destitute of means save as they might be derived from her estate in Virginia, then under the domination of the confederate power. That Miss Graham discharged her trust with fidelity and credit, and is justly entitled in natural justice, to a fair compensation out of that estate, upon the faith of which the parties all acted, and manifestly relied. Under the inexorable rule as laid down in the case of *Greenwold* v. *Waddington*, 16 Johns.; and *Coppell* v. *Hall*, 7 Wal.; the single bill for 1600 dollars given by Mrs. Wright to Miss Graham, was void; and if the action depended on the validity of that paper as the sole contract or ground of obligation, it could not perhaps be sustained. But the original indebtedness before the hostile relations arose, was not affected by that relation further than to suspend the payment during the war; and though the said note be void as a contract, it is nevertheless an admission of the party of a pre-existing obligation, and which may be enforced in a court of justice and proved by such admissions of the party. But in addition to this, the claim of Miss Graham rests on a higher consideration than mere contract; it springs out of the natural obliga-

tion of the parent to provide the offspring with the necessaries of life suited to its condition. So situated and surrounded by events over which the parties had no control, the mother unable to perform for her child these natural duties and obligations, as the best and all that she could do, casts them upon her kinswoman who did not, in the hour of need, either shrink from the task or betray the trust. Upon every principle of natural justice and relationship, she should be remunerated out of the mother's estate, which was then within her reach, and upon which the parties relied.

Whether the compensation so due would amount to the exact sum of 1600 dollars, it is not easy to determine; but upon the facts and circumstances of the case, it does not seem to be exorbitant nor extravagant, and taken in connection with Mrs. Wright's own admission, as made in the note given for it, it would seem at least satisfactory, if not conclusive, of the amount. I think, therefore, that the decree of the court below has done substantial justice between the parties, is right *in foro conscientia*, and under the prayer for general relief may be sustained on the pleadings and evidence in this cause. It ought, therefore, to be affirmed, with costs and damages to the appellee.

The other Judges reversed the decree, remanded the cause, and refer the same to a commissioner to ascertain the correct amount due the complainant, independent of the bond or any admissions contained therein.

DECREE REVERSED.